IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>MARTY FEINBERG,<br><br>Defendant. | Case No. 4:24-cr-00165<br><br>DEFENDANT'S SENTENCING MEMORANDUM |

**COMES NOW** attorney Defendant Marty Feinberg, by and through counsel, and hereby submits the following arguments in advance of sentencing.

## I.    FACTUAL BACKGROUND.

This case involves the failure to file tax returns over several years.  Normally, when a person fails to file taxes, the IRS starts doing a variety of enforcement mechanisms to get the returns filed, and the delinquent taxes paid.  First the IRS usually sends a letter asking for a tax return.  Then, if the tax return is not filed , then the IRS usually issues a notice of deficiency to the taxpayer.  Then the taxpayer has the chance to either file a petition with the tax court, or if they don't file, the IRS will come in and assess tax, interest and penalties.  The taxpayer then would start receiving notices of penalties and notices of tax liens and levies.  The IRS website even says, "the IRS usually only doles out civil penalties to most people, followed by numerous warnings and plenty of chances to file even years after the first offense."  "What Happens If You Don't File Taxes:  FAQ," number 2, available at:  https://www.irs.com/en/what-happens-if-you-dont-file-taxes/  (last accessed 3/4/25).  At sentencing, the defense intends to call James Monroe, a tax attorney, and specifically Mr. Feinberg's tax attorney, to explain these processes.

In Mr. Feinberg's case, the IRS did not send out any communications whatsoever, and did not send any letters asking for a tax return, a notice of deficiency, any notices of civil penalties, or any notice of levies or tax liens. The IRS also did not simply go to Mr. Feinberg, identify themselves as the IRS, and ask him about his taxes or tax returns.

Instead, the IRS sent in undercover agents to Mr. Feinberg, pretending that they were interested in partnering with him to open another recycling center.  During these meetings, people working for Feinberg at the recycling center came in and out of the room where the meeting was happening, and were observed by the undercover agents.  During the meetings, undercover agents asked Feinberg about people working for him and he told the undercover agents he does have people who work there in various capacities.  And, notably, during one of those meetings in November of 2022, the following exchange occurred:

*Undercover agent:  What's just a rough estimate of what you made last year?*

*Mr. Feinberg:  I don't really pay attention. I don't know.  Four or five hundred thousand.*
(FEIN_NOV_2022.006.avi, 16:27 – 16:40; Clip of Recording Exhibit A).

After receiving this information from Mr. Feinberg during the undercover meetings that indicated Feinberg had enough income to file tax returns, the IRS still did not send any letters, notices of penalties, liens, or levies.  Instead, law enforcement executed a search warrant on August 3, 2023, followed by this criminal enforcement action.  The government seized most of Mr. Feinberg's financial records during the execution of the warrants.  Feinberg was left not entirely sure what records he did, or did not, still have.  And, agents interviewed Feinberg without an attorney present, where he admitted he needed to get his tax returns filed.

After this first contact with the IRS, Feinberg immediately contacted a tax attorney (James Monroe) and worked with a tax preparer, to start trying to get his tax filings up-to-date.

On September 1, 2023, undersigned counsel communicated with the AUSA assigned to the case at the time, Andrea Glasgow, informing her that Mr. Monroe needed the seized financial records in order to properly prepare a Profit and Loss statement.  Ms. Glasgow responded that she would reach out to the agent and follow-up.  (Exhibit B).  That follow-up did not happen.  On September 7, 2023, Mr. Monroe sent the undersigned a letter which indicated that he was already working to get the tax returns filed, but that there were challenges in doing so, including that the government possessed many of Mr. Feinberg's physical records and Mr. Feinberg had not received any 1099s from one of his main income sources, Alter.  (Exhibit C).

It wasn't until May 8, 2024, after a new AUSA took over the investigation, that the first round of discovery was provided to Feinberg's attorneys.  These records did not include actual copies of the seized financial records, but did include a summary tax calculation done by the IRS from those records.  (Exhibit D – Redacted to remove reference to plea negotiations and unrelated property). Meanwhile, Feinberg's tax preparer and tax attorney attempted to get income records directly from Alter.   Alter should have sent, but never did send, 1099s to Feinberg.  But, Alter never responded to the requests for income records and never sent 1099s.

Meanwhile, Feinberg's tax preparers, unable to otherwise accurately recreate records that were either seized, missing, or not produced by Alter, decided instead to use the government's own summary income numbers, and filed his 2017-2021 tax returns for 2017-2021 utilizing these numbers.   The tax preparers also used BizMiner to calculate Feinberg's expenses.  BizMiner is an accepted method of estimating expenses when records are not available.  The returns were mailed out by the tax attorney on August 30, 2024 (for 2017-2020), and September 12, 2024 (for 2021), approximately 3 ½ - 4 months after receiving the income summaries from the government.  Copies of these returns were provided to the government.  (Exhibits E, F, G, H, I).

At the same time, information and legal support for the use of BizMiner in filing the delinquent returns was provided to the government. (Exhibit J; *Bauer v. Comm'r*, 2012 Tax Ct. Memo LEXIS 155 (US Tax Court June 4, 2012)(Exhibit K)). The *Bauer* case (and others) supports the use of BizMiner for filing of taxes. Specifically, the *Bauer* case also approved the use of BizMiner in estimating the cost of contract labor on tax return filings.

On September 16, 2024, after all of the tax returns were mailed, the government provided the recordings of the undercover agents' contact with Feinberg in discovery. These recordings, unbeknownst to the defense at the time the tax returns were prepared to counsel, directly support the figures claimed in Feinberg's tax returns. (Exhibit A)

On October 15, 2024, Feinberg timely filed his 2023 tax return because Feinberg was able to produce income and expense records from 2023. (Exhibit L – filed version provided by IRS in discovery). BizMiner was not used for 2023 because it wasn't necessary, given Feinberg's access to his actual records. The tax professionals could not, however, file 2022 tax returns yet because they did not have the actual records (some were seized by the IRS) and they did not have the income records, either from the IRS or from Alter and other income sources. And so, absent the return of all of the seized items, and further investigatory work, 2022 tax returns can not yet be filed with any sort of accuracy. The defendant and his tax professionals are still, however, intending on filing 2022 returns, when possible.

It wasn't until February 26, 2025, that the government supplemented its discovery, and announced that it would be basing its "loss amount" in this case not based on BizMiner, not based on Feinberg's 2017-2021 tax filings, but instead by using Feinberg's 2023 tax return. The government then extrapolated percentages from his 2023 tax return to the prior years, but subtracted all contract labor.

To date, the IRS has not sent any notices of deficiency to Feinberg and no tax court has yet to determine if there is any deficiency in any of the tax returns as filed. Feinberg has made two payments - $61,302 for payment in full for the 2017 taxes owed, and $51,675 for the 2018 taxes owed. (Exhibit M).

## II.    THE TOTAL UNPAID TAX AMOUNT SHOULD RESULT IN A BASE OFFENSE LEVEL OF 18.

The dispute for this court is whether the "tax loss" at issue here is in the range of $250,001-$550,000 as the defense suggests, resulting in a base offense level of 18, or if it is $550,001 - $1,500,000, as the government suggests, resulting in a base offense level of 20. There would not be "restitution" ordered by this court under the terms of the plea agreement (and would complicate the collection of taxes since some of the delinquent taxes have already been paid), instead the parties agreed that Mr. Feinberg would make payments directly to the IRS. (See Plea Agreement, paragraphs 23 and 24). The question for the court is only what is the approximate amount of tax that would have been due, had the returns been filed in order to determine the most appropriate advisory guideline base offense level from the Tax Table.

There are two discrepancies in how the parties are determining the loss amount. First, Mr. Feinberg's tax preparers utilized BizMiner to estimate expenses, due in part to the fact that the government seized many of the records (and to date has not given them back). The government has instead extrapolated percentages from Mr. Feinberg's 2023 tax return. As Mr. Monroe can explain, the method of using BizMiner would be more accurate than simply extrapolating percentages from the 2023 return. The second dispute is whether or not the defendant should be allowed to deduct contract labor as an expense. The defendant deducted the contract labor (through the estimates provided by BizMiner), the government did not (by deleting the extrapolated expense line for contract labor in Exhibit 1). The defendant submits that the

contract labor should be deducted because it is clear from the record that the contract labor was,

in fact utilized, and there are records demonstrating he used such labor (some of which were

seized and retained by the government).

The use of BizMiner actually results in **more** tax than the method of extrapolating from

2023. Since the more accurate methodology for determining the correct amounts for the tax

return is BizMiner (as opposed to extrapolating from 2023's return), the court can safely attribute

level 18 as the appropriate base offense level. As the court can see from the BizMiner financials

provided in the tax returns, the markets drastically impact the percentages common in the

industry year to year. (See, for example, Exhibit E, page 14). Thus, it is a more accurate way to

extrapolate expenses in a given industry (which is why the IRS allows it in tax filings) than

extrapolating from a subsequent year's tax return like the government did.

| YEAR | Extrapolate 2023 total income not allowing labor deduction[1] | Extrapolate 2023 total labor cost | Extrapolate 2023 total income allowing labor deduction (Total income minus total labor cost) | Total tax loss not allowing labor deduction[2] | Total tax loss allowing labor deduction (approx.) |
|---|---|---|---|---|---|
| 2017 | 527,633 | 301,675 | 225,691 | 169,968 | $72,221 (at 32%) |
| 2018 | 542,281 | 310,050 | 232,231 | 197,357 | $74,313 (at 32%) |
| 2019 | 367,168 | 209,929 | 157,239 | 146,144 | $50,316 (at 32%) |
| 2020 | 420,846 | 240,620 | 180,226 | 151,828 | $57,672 (at 32%) |
| 2021 | 892,031 | 510,021 | 382,010 | 358,337 | $129,883 (at 34%) |
| TOTAL TAX LOSS | | | | $ 1,023,634 | $384,405 |

[1] From Government's Exhibit 1.
[2] From Government's Exhibit 2.

| YEAR | BizMiner total income (from tax returns) | Total tax loss using BizMiner[3] |
|---|---|---|
| 2017 | 190,304 | 61,302 |
| 2018 | 198,076 | 51,675 |
| 2019 | 212,161 | 58,793 |
| 2020 | 273,210 | 70,052 |
| 2021 | 487,288 | 168,919[4] |
| TOTAL | | $410,741[5] |

Notably, then, the BizMiner approach clearly results in about $25,000 more in a tax loss than the extrapolated approach used by the government. The only difference is the government's deletion of 100% of all contract labor from the expenses and the defendant's use of BizMiner to extrapolate reasonable expenses in the industry for such things as labor.

That leads to the second disputed issue – whether to disallow 100% of all contract labor (something the IRS would not even do in the civil context) or to allow it. The defense submits that the BizMiner stats accurately account for a reasonable amount of labor as calculated across this industry. Or, alternatively, even if the court uses the government's method for calculating tax loss, if the contract labor is accounted for in that extrapolation, the tax loss is even lower than the amount submitted by the defendant. Regardless, using either method, still both results in a loss amount below $550,000.

---

[3] Tax due amounts from tax returns as filed, using BizMiner, Exhibits E-I.

[4] This amount is misreported in paragraph 13 of the PSR as $198,919. (See Exhibit I).

[5] The total is incorrect in paragraph 14 of the PSR given the error in paragraph 13 of the PSR. (See Exhibit I)

There can be no real question that Feinberg had actual labor costs.  The agents know he was paying labor, they saw the individuals providing labor while they were there, and they have seen the 2023 tax returns claiming the labor costs.  In addition, Feinberg's response on Exhibit A roughly estimating his tax returns to the fake potential buyers on the recording produced on September 16 (claiming he made between $400,000 and $500,000 in 2021), matches his 2021 tax return that was filed on September 12 (which accounts for the labor costs).  Exhibit I, Feinberg's 2021 return as filed shows a net income from the business as $401,187 (Exhibit I, p. 8), and a total taxable income on his personal return of $460,512.  (Exhibit I, p. 2).  The government, on the other hand, claims Feinberg's net profit should be calculated at $892,031.59 (Exhibit 1), and that he should be attributed a total tax of $358,337 (Exhibit 2E).  If the government's tax amount is accepted, this is over a 77% tax rate.  This is not a "reasonable" calculation of the tax loss.  Nor is there any evidence that Mr. Feinberg actually retained anywhere close to this amount of money in 2021.

The government relies on one comment to the guideline 2T1.1, Application note 3, which gives examples for disallowed deductions in determining tax loss, but the government does not include the full text of the application note in their argument.  The note actually reads, "the court shall not account for payments to third parties made in a manner that encouraged or facilitated a separate violation of law (e.g. 'under the table' payments to employees **or expenses incurred to obstruct justice**.")  Here, there is no evidence that not filing 1099s for contract labor constituted any sort of encouragement or facilitation for a violation of the law – indeed the contract laborers would still be required to file their income taxes regardless of whether or not they received 1099s.  (Case in point – Mr. Feinberg himself did not receive 1099s from Alter or other income sources, yet clearly he owes taxes from this income).  There has been no other evidence, or even

implication, that Mr. Feinberg paying these contractors was somehow otherwise obstructing justice. And, the payments for contract labor are not "under the table payments to employees" because contract laborers who are to receive 1099s are not "employees," they are independent contractors.

The government cites no case that disallows deductions for payments made to contractors on taxes for the sole reason that 1099s were not filed – because that is not the law. Such deductions *are* commonly allowed. Even the case *Bauer v. Comm.*, 2012 Tax Ct. Memo Lexis 155 (Exhibit K) allows for the use of BizMiner to calculate such expenses for purposes of deductions from taxes. Indeed, 1099s are not even required to be filed for all contract labor, they are only required when a certain income level for a contractor is reached. To the extent that the government is implying that these workers are misclassified as 1099 independent contractors, and instead should be considered employees, that evaluation is much more complicated than a simple footnote in a sentencing brief.

Mr. Feinberg does have hundreds pages of records, as well as handwritten records, of what and how much various contractors worked (samples from 2023 provided in Exhibit N). But, many more of these records are presumably still within the control of the government post-search warrant because it wasn't until February of 2025 that this question of disallowing contract labor was even raised by the government. Mr. Feinberg's operation of the junkyard, and failure to send in 1099s, was not a situation of "under the table" payments to "employees" – Mr. Feinberg kept records and made payments pursuant to his records. He just did not file 1099s. That failure does not disqualify the payments from being a deduction on his taxes, and it should not result in the court dishonoring the deductions for purposes of considering the tax loss here.

### III.    OTHER OBJECTION TO THE PRESENTENCE REPORT.

Paragraph 36 of the presentence report does not indicate the actual factual basis for the plea referenced in the paragraph, only the charged conduct.  The PSR claims the defendant "stole more than $10,000 in property." But the factual basis of the plea, attached hereto as Exhibit S, shows the factual basis as he "did exercise control over stolen property having reasonable cause to believe that such property had been stolen" and that the value "exceeded five hundred but not more than one thousand dollars."  (Exhibit S).  This should be amended in the PSR.  Paragraph 36 also states that the probation office has no information regarding the defendant's conduct on probation.  But, the public file of this conviction contains a field discharge report that demonstrates that Mr. Feinberg was exemplary on probation, paid all his fines and restitution promptly, and discharged early.  (Exhibit T).

The defendant does not continue to maintain the objection to the one criminal history point for the bad check theft conviction referenced in PSR paragraph 37 under 4A1.2(o).  This does, however, create an overrepresentation of his criminal history category.  He received a fine for this bad check (which was

### IV.    EXHIBITS FILED.

Several sealed exhibits and a listing of those sealed exhibits A-R were filed separately to this sentencing memorandum. Non-sealed exhibits S and T were filed attached to this memorandum.

Exhibit S:  Guilty plea document in relation to Paragraph 36 of the PSR.

Exhibit T:  Discharge of probation showing exemplary conduct on probation.

**V.    SECTION 3553(A) FACTORS SUPPORT A SENTENCE OF PROBATION.**

The government argues that there are factors that support a sentence within the guidelines, but those purported factors are not supported by the facts.

First the government claims that the defendant only filed delinquent returns "after search warrants were executed and he was engaged in plea discussions with the government" (Gov't Memo p. 6.)  But that is misleading.  Mr. Feinberg hired tax professionals immediately after the search warrant, before he even knew there would be criminal charges, and months before there were any plea negotiations.  (Exhibits B, C, D).  The only reason it took so long for the tax professionals to complete the returns was they did not have access to income or expense records that had been seized by the government.  (Exhibits B, C).  The only reason the tax professionals even could file returns at all was because the government produced income summaries on May 8, 2024, and they used BizMiner in the absence of the expense records.  (Exhibit D, E, F, G, H, I, J).  So this was not a case where Mr. Feinberg continued to delay filing tax returns until "plea negotiations."  He had already hired the tax professionals to get updated on his tax returns within a few days of the search warrant, which was his first interaction with the IRS.

The government also claims that the Defendant has yet to make any actual payments on his taxes, but as demonstrated by Exhibit M, Mr. Feinberg has paid a substantial amount of the past due taxes.  He has paid the taxes due in full for 2017 and 2018.  So, payments have been made prior to adjudication, a factor for consideration by this court that favors Mr. Feinberg, rather than disfavoring him as the government argues.  USSG 3E1.1 comment n. 1(C) and (H).

And the government claims that the nature and circumstances of his offense are aggravating.  But, to the contrary, the nature and circumstances must necessarily include the fact that Mr. Feinberg was never given any of the chances a normal taxpayer would be given when

failing to file tax returns.  His first, and only, interaction with the IRS was when they executed

the search warrant.  After which, he immediately complied with his tax obligations and began

preparing to file his delinquent returns.  And so, this is not a situation where someone has been

given chance after chance, notice after notice, from the IRS, and he thumbed his nose at them.

Instead, he was not given those chances like most people would have been, otherwise, it seems

clear from his actions in filing the tax returns, and paying the taxes, that he would have remedied

this situation the first time he was contacted by the IRS.  He just never had the chance to do that

in this case.

There are also mitigating factors that warrant consideration, and a probationary sentence.

First, Mr. Feinberg's home situation warrants consideration.  Recently he and his long-time

fiancé took in three young children into their home for the reasons stated in sealed Exhibit R. For

the reasons detailed in this letter, Mr. Feinberg should be considered for probation and/or home

confinement.

Second, Mr. Feinberg's health requires consideration.  He underwent a left hip

replacement in January of 2025 (PSR paragraph 60; Exhibit Q).  It is not accurate to state that the

defendant "does not experience any ongoing issues."  A hip replacement always involves

ongoing issues, including physical therapy.  And, Mr. Feinberg has recently been seen again by

his providers for follow-up care due to complications from this surgery.  Counsel has requested

records, and will provide those when received.

And finally, Mr. Feinberg's employment status should be considered.  Should he be

placed in prison, he will lose all income, and will be unable to continue to make payments on his

delinquent taxes.  As his assets, and his pictures of his home and business show, even if he

liquidated everything, he does not have the resources available to pay the full amount of the

taxes due without continuing to work.  He respectfully requests the court to consider allowing

him to continue to work so that he can continue to make payments on his taxes going forward.

Notably, his "positive net worth" detailed in PSR paragraph 81, does not take into account the

hundreds of thousands of dollars (regardless of which loss amount is used) that he owes to the

IRS.

     For all of these reasons, Mr. Feinberg requests a sentence of home-confinement, or of

probation, so that he may continue to be employed, may continue to provide support to the

children in his home, and continue to make payments on his taxes.  He also respectfully requests

that the court find he does not have the ability to pay a fine, given the large amount he owes to

the IRS both in back taxes, and also in interest and penalties (not taken into account in the PSR

or the loss amount).  Should the court sentence him to prison, the defense would be requesting

that he be allowed to self-report.

                           Respectfully submitted,

                           /s/ Angela L. Campbell
                           Angela L. Campbell, AT0009086
                           DICKEY, CAMPBELL & SAHAG LAW FIRM,
                           P.L.C.
                           301 E. Walnut St., Suite 1
                           Des Moines, Iowa 50309
                           PHONE: 515.288.5008
                           FAX: 515.288.5010
                           E-MAIL:  angela@iowajustice.com

                          ATTORNEY FOR DEFENDANT

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on March 5, 2025.

By: ____ U.S. Mail          ____ FAX
    ____ Hand Delivered      ____ Overnight Courier
    ____ Certified Mail       X  Other: ECF

Signature:  /s/ Angela Campbell _____